RECEIVED
APR 29 2019
BY MAIL

# UNITED STATES DISTRICT COURT

for the

8th Circuit

Eastern District of Missouri

Eastern Division

| | | |
|---|---|---|
| Richard C. Carrier, Ph.D. | ) ) ) | Case No. |
| *Plaintiff* | ) ) ) | |
| | ) ) | Jury Trial:   √ Yes    No |
| -v- | ) ) ) ) ) | |
| Skepticon, Inc. and Lauren Lane | ) ) ) ) | |
| *Defendants* | ) ) | |

## COMPLAINT FOR A CIVIL CASE

### I.   The Parties to This Complaint

**A.   The Plaintiff**

Here petitioning *pro se* is Richard C. Carrier, Ph.D., residing at

134 West Tulane Rd., Apt. B, Columbus, Ohio 43202-1943 (Franklin County)

Phone (mobile): (510) 932-9536
Email: richard.carrier@icloud.com

_____

**B.** **The Defendants**

Skepticon, Inc., incorporated under the laws of State of Missouri with its principle place of business in the city of Springfield (in Greene County).

*Address of Record:*

9051 Watson Rd., #140
Saint Louis, MO 63126-2241 (independent city)

*Address of Registered Agent:*

Registered Agents, Inc.
117 South Lexington Street, Ste. 100
Harrisonville, MO 64701-2444 (Cass County)

and

Lauren Lane, currently President of Skepticon, Inc., residing at

31 Apostle Court
Fenton, MO 63026-2766 (St. Louis County)

## II. Basis for Jurisdiction

1. This Court enjoys subject matter jurisdiction over this action under 28 U.S.C. § 1332(a)(1) because the Plaintiff and Defendants are citizens of different states and the amount in controversy exceeds $75,000.

2. This Court enjoys personal jurisdiction over the Defendant pursuant to 28 U.S.C. § 1391(b)(1) because Missouri is the judicial district in which the Defendant resides.

3. This Court enjoys venue under 28 U.S.C. § 1391(b)(2) because all or a substantial portion of the events that gave rise to Plaintiff's claims accrued within the State of Missouri, including Defendant's publication and republication of the defamatory falsehoods in and from the district.

### III.  Statement of Claim

4. Plaintiff, Dr. Richard Carrier (hereinafter "Dr. Carrier" or "Plaintiff"), is an author and public speaker, a Ph.D. in the history of philosophy from Columbia University, a baccalaureate of the University of California Berkeley, and author of numerous scholarly books and articles published by reputable publishing houses, including, *Sense and Goodness Without God* (2005), *Not the Impossible Faith* (2009), *Why I Am Not a Christian* (2011), *Proving History* (2012), *Hitler Homer Bible Christ* (2014), *On the Historicity of Jesus* (2014), *Science Education in the Early Roman Empire* (2016), and *The Scientist in the Early Roman Empire* (2017). Dr. Carrier has authored chapters in many other books and articles in magazines and academic journals, and on his namesake blog. Dr. Carrier lectures and teaches worldwide. Dr. Carrier has been a resident of the State of Ohio since May of 2016.

5. Defendant, **Skepticon, Inc.**, skepticon.org (hereinafter "Skepticon" or "Defendant"), was founded in 2008 by Defendant Lauren Lane and others, and became one of the largest skeptic and secular conventions held in the United States. According to its mission statement, Skepticon supports, promotes, and develops free-thought, skeptic, and scientific communities through educational programming. Quoting Skepticon organizer JT Eberhard, "[s]keptics conferences are an important part of the movement. They not only grant people access to the icons of the movement, they also arm those in attendance with information . . ." Skepticon is a nonprofit corporation exempt from taxation according to 26 U.S.C. § 501(c)(3), and incorporated in the State of Missouri with its principal place of business in the city of Springfield.

6. Defendant, **Lauren Lane** (hereinafter "Lane" or "Defendant"), co-founded Skepticon, Inc., where she currently serves as president. As a writer, Lane has been published to The Friendly Atheist, and MadArtLabs. She has spoken at conventions that include the Secular Student Alliance Convention, FtBCon, and Reason in the Rock.

7. Defendant Lane is the author of the June 20, 2016 story entitled, "Keeping Skepticon Safe: Richard Carrier To Be Banned," published on the official Skepticon website in her capacity as president of Skepticon. Defendant Lane resides in Missouri.

8. The number of broadband subscribers in the United States with access to Defendant's statements is more than 100 million according to the Organization of Economic Cooperation and Development ("OECD"). *Total Fixed and Wireless Broadband Subscriptions by Country* (Dec. 2015), available at http://www.oecd.org/internet/broadband/oecdbroadbandportal.htm (last visited August 11, 2016). The number of broadband subscribers in other English speaking nations with access to Defendant's statements, according to the OECD, is as follows: UK 24.65 million, Canada 13 million, Australia 6.76 million, New Zealand 1.47 million, and Ireland 1.3 million. *Id.*

## CASE HISTORY

9. Defendants' defamatory statements were among a series of other parties publishing further defamation of the Plaintiff, causing Plaintiff to file a multi-count suit against all parties, including Defendants, on September 20, 2016, in the United States District Court, Southern District of Ohio, Eastern Division (*Richard Carrier v. FreethoughtBlogs Network et al.*, hereafter *Carrier v. FreeThought Blogs*; Case Number 2:16-cv-00906, judge Michael H. Watson and Magistrate Judge Deavers presiding).

10. Previous to that action, on July 26, 2016, Dr. Carrier, by and through counsel, sent to Defendants Skepticon, Inc. and Lauren Lane cease and desist letters by Certified U.S. Mail. Among other demands, Dr. Carrier insisted on a full written retraction (*Carrier v. FreethoughtBlogs*, Complaint, Dkt. 1, Exhibit 8; received on August 2 and August 8, respectively, Ibid., Exhibits 13 and 14). In response to which Defendants reaffirmed their defamation of Plaintiff. Subsequent to which Plaintiff sued the Defendants.

11. Through common counsel the defense in *Carrier v. FreethoughtBlogs* then filed a motion to dismiss for lack of personal jurisdiction in December of 2016, alleging that Ohio was an improper venue for Plaintiff's action. This motion and others were contested in court through an arduous series of motions and briefs until the Ohio court ruled in favor of the defense, but without prejudice, instructing Plaintiff to re-file in another state (*Carrier v. FreethoughtBlogs*, Decision & Entry, Docket No. 43, issued November 14 of 2018)..

12. Plaintiff had filed suit against the Defendants by September 20, 2016, within four months after the initial defamation was published, which is within the statute of limitations for both Ohio and Missouri. Plaintiff also filed a motion in Ohio court to toll the statute of limitations on 13 June of 2017, which is less than one year after the initial defamation was published, which is also within the statute of limitations for both Ohio and Missouri. Which motion the Ohio court "denied without prejudice…as moot" (Ibid., p. 5), instructing Plaintiff to re-file later in an appropriate jurisdiction and address therein the objections to tolling the statute that were stated in Defense's original Brief in Opposition to that motion.

13. Plaintiff has acted accordingly and is so doing. The requisite response to opposing a tolling of the statute in Missouri is provided herein, after the statement of facts in this case.

## STATEMENT OF FACTS

14. The Plaintiff adopts, re-alleges, and incorporates by reference all allegations of the foregoing Paragraphs, as if they were set forth in full herein and further alleges the following matters.

15. Through and as a result of his accomplishments in a career spanning more than two decades, Dr. Carrier has become well known to the public throughout the United States and the world as a professional writer, lecturer, and teacher, and has created for himself a unique public personality and image; and his image, likeness and public personality have become commercially valuable commodities.

16. Dr. Carrier's current occupation is that of author, co-author, lecturer, teacher, debater, and blogger, and he continues to write books professionally and tour the United States and beyond to promote and sell his work. He pursued this occupation part-time for decades, developing a fan base and revenue and reputation as an honest and reliable authority, and has pursued this occupation full-time since January of 2015.

17. Dr. Carrier has also been and wishes to remain an active political, social, and philosophical commentator, and an active professional scholar who participates in academic societies, conferences, and research, for all of which his reputation is a valuable asset.

18. Dr. Carrier has had professional relationships and valid ongoing business expectancies with various reputable publishing houses and co-authors.

19. Dr. Carrier has had professional relationships and valid ongoing business expectancies with organizations that include: the Secular Student Alliance (SSA), and the SSA's hundreds of campus affiliates, Camp Quest, and its many regional affiliates, the Center for Inquiry, the Freedom From Religion Foundation, the United Coalition of Reason, American Atheists, Atheist Alliance of America, the American Humanist Association, and the Council for Secular Humanism, and hundreds of other secular and religious community groups across the United States and beyond, which include organizations of humanists, atheists, and skeptics, as well as ethical societies, and churches and religious organizations (who have hired him for interfaith work). All of which have been his principal source of speaking and direct sales income.

20. In January of 2015 Dr. Carrier also became an outspoken polyamorist and advocate for polyamory, or "ethical non-monogamy," endorsing and ethically pursuing open and multiple relationships. He has for many years been an outspoken advocate for ethical conduct in the treatment of women and men, and an ardent defender of responsible, sex-positive feminism, and ethical non-monogamy, and as a crucial part of that advocacy, he has himself always respected anyone's stated boundaries, and would never subject anyone to actual harassment of any kind.

### *Defendant's False and Defamatory Statements*

21. On June 20, 2016, Skepticon, Inc. (Defendant) published an announcement by Skepticon president Lauren Lane (Defendant) on its official website, skepticon.org (hereafter "Announcement"). Ms. Lane's article reads, in its entirety, as follows:

"KEEPING SKEPTICON SAFE: RICHARD CARRIER TO BE BANNED" by Lauren Lane | Jun 20, 2016

"In light of the recent revelations of sexual harassment, unwelcome attention, and/or unwanted behavior from more than one prominent atheist, Skepticon would like to renew our vow to keep our attendees, speakers, volunteers, vendors, organizers, and anyone else involved in Skepticon safe at our events.

"The accusations specifically against Richard Carrier are, sadly, not so surprising to the Skepticon organizers. While he was a featured speaker for many years, we stopped inviting him to speak partly because of his repeated boundary-pushing behavior, including towards someone involved in Skepticon. What has been made clear by the recent discussions is that our attendees' well being and comfort is put at an unacceptable risk by Carrier's presence, and so we are officially prohibiting Richard Carrier from attending any future Skepticons.

"We support the accusers.

"It is unfortunate there are people in this world who believe they can violate others' boundaries without consequence. Skepticon does not want those people at our events. "Our harassment policy can be found here. We are currently refining our method of handling such complaints so as to be as effective as possible when faced with them. We are investigating formal training options for our organizers and volunteers, and are forming a team who will be dedicated to protecting everyone at Skepticon."

22. A true and correct copy of Ms. Lane's June 20, 2016 article is attached hereto marked **Exhibit 1**.

23. False and defamatory statements attached hereto as Exhibit 1 include, but are not limited to, the assertion that Dr. Carrier engaged in "repeated boundary-pushing behavior" at Skepticon or with anyone associated with Skepticon, and that Skepticon, Inc., "stopped inviting [Dr. Carrier] to speak partly because of" the alleged incidents "including towards someone involved in Skepticon," alleging multiple incidents, and alleging the intention as early as 2013 to exclude the Plaintiff's presence at Skepticon for this reason, and the assertion that "attendees' well being and comfort is put at an unacceptable risk by Carrier's presence . . ."

24. The quoted passage attached hereto as Exhibit 1 is defamatory, intentionally reckless and malicious.

25. Evidence will show Defendants made no effort to investigate or substantiate this or any other statements' veracity before newly publishing and republishing allegations Defendants either knew to be false or made with reckless disregard as to truth or falsity.

26. Subsequent to receiving Dr. Carrier's cease and desist letter, on or about September 1, 2016, Defendants Skepticon, Inc. and Lauren Lane responded, by and through counsel, in a letter sent to the Plaintiff's lawyer, sustaining and reaffirming their June 20, 2016 attacks (hereafter the "Letter"). A true and correct copy of Defendant Skepticon's and Lane's response is attached hereto marked **Exhibit 2**.

27. In their response, Skepticon and Lane affirmed their defamatory statements are assertions of objective fact, not mere opinion nor ordinary rhetoric, and additionally asserted evidence of statements by third parties, expressly affirming accusations of sexual harassment by multiple accusers against Dr. Carrier. *Id.*

28. On page 2 of that letter (*Id.*), Defendants allege through counsel the following:

> "To the extent the Post accuses Dr. Carrier of sexual harassment "towards someone involved in Skepticon," this is true, and will be proven in court, if necessary. Ms. Lane will testify about the many occasions on which Dr. Carrier made unwanted sexual advances towards her, including but not limited to touching her knees and hugging her without permission; leering at her; asking her inappropriate questions; and making harassing and sexually-charged comments about and towards her. ...

> "... Evidence in the case will also consist of statements from third parties involved with Skepticon, including Skepticon speakers and attendees, who have also been sexually harassed by Mr. Carrier. In light of the conflicting evidence, Dr. Carrier will be unable to carry his burden of showing that Skepticon made a false statement of fact about him."

29. False and defamatory statements in the letter attached hereto as Exhibit 2 include, but are not limited to, the assertion that Dr. Carrier engaged in "sexual harassment...towards someone involved in Skepticon," that he made "unwanted sexual advances towards" Lane, that he ever touched her "without permission," or engaged in any behavior with her without her consent; and the assertion that there were other persons, "including Skepticon speakers and attendees, who have also been sexually harassed" by the Plaintiff, and that such persons will provide statements to that effect.

### *Evidence of Actual Malice*

30. At the time they were written, Defendants knew formal complaints against Dr. Carrier for sexual harassment were never filed nor ever investigated or verified.

31. Demonstrative of Defendants' malice or reckless disregard as to truth or falsity, evidence will show all the Defendants' claims here alleged defamatory were not only false, but that they knew them to be false.

32. Such evidence includes email correspondence received from the Defendants during limited discovery in the process of litigating *Carrier v. FreethoughtBlogs* (which, already confirmed by prior discovery, will be submitted to the present court when required); witness testimony, including from Defendant Lane's own close friends, present and past, who will be subpoenaed to testify when required; and Plaintiff's testimony (see "Affidavit of Richard Carrier Concerning Lauren Lane," attached hereto marked **Exhibit 3**).

33. The facts of the case that will thereby be more than evidenced, and demonstrate the Defendants' knowledge of the falsehood of their defamatory "Announcement," include the following:

A. It was Lauren Lane who openly flirted with and pursued the Plaintiff for years, ever since she first employed him as a speaker at the first Skepticon in 2008, and every Skepticon thereafter, and on occasions in between, until she herself initiated a sexual relationship with the Plaintiff at Skepticon in 2012.

B. An email exchange from April of 2010 will show Lauren Lane encouraging Dr. Carrier to discuss his sexual desires with her, and her strongly implying interest in fulfilling them. Furthermore, these emails follow over a year of Lane's flirting with Carrier in person across two previous Skepticons.

C. An email exchange from October of 2011 will show Lauren Lane seeking a sexual relationship with the Plaintiff.

D. Eyewitnesses have already verified in sworn affidavits that at Skepticon in November of 2011 Lane enthusiastically initiated physical affection with the Plaintiff, and not the other way around as Defendants allege (*Carrier v. FreethoughtBlogs*, Complaint, Dkt. 1, Par. 81(a)-(c), ref. Exhibits 22 and 23).

E. Lane then initiated a sexual relationship with the Plaintiff at Skepticon in November of 2012, and did so unasked, by simply undressing and jumping into Plaintiff's bed—as witnessed by two other persons present on the occasion, mutual friends of the Plaintiff and Defendant Lane. Both will testify to this fact; and one has already provided a sworn affidavit affirming it (*Carrier v. FreethoughtBlogs*, Complaint, Dkt. 1, Par. 81(a)-(c), ref. Exhibit 22).

F. Plaintiff was at that time married and not at that time in an open relationship and thus Lane was initiating an illicit affair with the Plaintiff; a fact of which the Defendant was aware. Distraught over cheating on his wife, Plaintiff then broke up with Lane some months later at a different conference in early 2013, which both attended.

G. Defendant Lane then harassed Plaintiff with repeated requests to resume their relationship even after repeatedly being told to stop, forcing Plaintiff to cut off all communication with the Defendant, who then continued to communicate her desires through a mutual friend (*Carrier v. FreethoughtBlogs*, Complaint, Dkt. 1, Exhibit 22, par. 16).

H. Some months later the Plaintiff and his wife opened their marriage, and the Plaintiff, believing from all the foregoing that Defendant Lane would desire to resume their prior relationship, sought to renew it by sending Lane a single salacious message in the tone and manner they were accustomed to engage in while together. This message was sent privately, at least a week before any forthcoming conference.

I. Lane expressed displeasure in her reply to that singular message, at which Plaintiff apologized and never resumed any expression of interest in or physical contact with Lane.

J. At the following Skepticon in November of 2013, Lane asked that the Plaintiff meet her to discuss these events, at which meeting Plaintiff reaffirmed his apologies; while Lane expressed dislike of his being openly affectionate with other women at that event, even though they were consenting participants in it, and Carrier's relationship with Lane was concluded.

K. An email Lane sent the Plaintiff immediately after that event verifies that she accepted the Plaintiff's apology and did not object to any other behavior of his than he had already apologized for; voicing instead only objections regarding Plaintiff's manner of relationship communication, and not anything about unwanted touching or harassment.

L. Months later, in March of 2014, Lane sent an email to the Plaintiff in which she personally and enthusiastically invited him to speak again at the next Skepticon, wholly incongruous with any belief the Plaintiff had sexually harassed her, or anyone.

M. Emails received on discovery show by April of 2014 Skepticon staff were even announcing Dr. Carrier to other speakers (including women) as sharing the roster with them.

N. Then in June of 2014, Lane sent an email to the Plaintiff disinviting him from speaking at the next Skepticon in November of 2014, in which she states as the only reason the fact that she wanted to diversify the roster; in that same email Lane invited Dr. Carrier to nevertheless still attend the conference and even run a workshop there, which contradicts any allegation that she regarded Carrier as having sexually harassed her, or anyone, and proves false her and Skepticon's public allegation that they disinvited him even partly for that reason—as surely were that so, they would not have still invited the Plaintiff to attend that conference and even run a workshop at it.

O. Plaintiff chose not to attend in 2014, but did go to Skepticon in 2015 as a regular attendee; and in September of 2015, after the Plaintiff registered to attend that Skepticon, Lane, representing Skepticon, sent him a personal thank you message—identifying him intimately by the nickname "Rick" and expressing excitement at his attendance; behavior essentially impossible if the Plaintuff had been disinvited even partly for sexual harassment as Lane would later allege in 2016.

P. At that Skepticon in November of 2015 Dr. Carrier engaged in no physical contact or flirtation with Lane, as all available witnesses will attest; they met and were in shared group conversations but spoke only briefly and were never even within arm's length of each other; and no mention was ever made, by anyone, of his being unwelcome there or of there having been a claim of sexual harassment against him.

    Q. No such mention occurred in official Skepticon internal correspondence either—not during, nor before, nor at any time after that conference prior to publication of the "Announcement"—as is now known due to the receipt of all email and other documented correspondence from Skepticon and Lane for all relevant years during limited discovery in *Carrier v. FreethoughtBlogs*. That correspondence shows not only complete silence as to the allegations Defendants' "Announcement" falsely alleges they were aware of, but contains instead many positive remarks about the Plaintiff, disproving any such awareness.

    R. Other witness testimony from Lane's own close friends will further demonstrate she (and therefore Skepticon, Inc.) had no conception of the Plaintiff having been a sexual harasser or disinvited from speaking at Skepticon for that reason, even by the time of his attending the 2015 conference, a year and a half after actually being so disinvited.

    S. After that conference, Plaintiff and Defendant Lane never saw or communicated with each other again.

34. As these facts will show, not only is the Defendants' assertion that the Plaintiff was disinvited for sexually harassing Lane or anyone else false, but the Defendants knew it was false when they published their "Announcement" containing that false claim;

35. Those same facts will show none of the Defendants' assertions about the Plaintiff are true, which means Defendant Lane lied about them, and did so as an official representative of Skepticon, which entails the Defendants' knowledge of those statements' falsehood;

36. Those same facts will show Skepticon, Inc., prior to the published "Announcement," conducted no investigation of any claims of sexual harassment against the Plaintiff and did not even know of such claims.

### *Supporting Evidence of Actual Malice*

37. Demonstrative of Defendants' malice or reckless disregard, during a previous FreethoughtBlogs Network virtual conference (in 2014) that Defendant Lane and other Skepticon staff attended and participated in, the policies and practices described herein were the topic of a presentation styled *Sexual Harassment Law and You*, in which California attorney and law blogger Ken White expounded sexual harassment laws and private anti-harassment policies for convention organizers, to wit:

"... *it's good policy to ask the accused for their side of events*, because, number one, it gives credibility and effectiveness to the anti-harassment policy and the procedure. And, number two, it wards off potential litigation, possibly bogus litigation, *possibly litigation with some merit in it* ..." (emphasis added).

"... an anti-harassment policy *doesn't mean* that you automatically believe, or accept, everything that's ever said to you in a complaint" (emphasis added).

"[One] ... step in investigation that your investigators need to know about, is *talking to witnesses*. And you need to talk to the complaining... the complaining person, Who saw this? Who else might know about it? Who can we talk to? And then *you need to talk to these people* ..." (emphasis added).

38. A full transcript of *Sexual Harassment Law and You* is available at http://the-orbit.net/lousycanuck/2014/02/08/ftbcon2-sexual-harassment-law-and-you-with-full-transcript-ftbcon/.

39. Defendants not only failed to adhere to any of these standards before declaring Plaintiff guilty of sexual harassment, but as evidence will show, they refused to do so even when specifically asked to by the Plaintiff in order to avert a lawsuit.

40. The foregoing policies and practices, though known to Defendants, were willfully disregarded as to Dr. Carrier, and go to Defendants' ill will or reckless disregard for truth or falsity. Defendants were willfully blind as to the Plaintiff, in light of Defendants' experience and responsibility as a professional organization and officers thereof.

### *Evidence of Effect*

41. Defendants' defamatory statements above have been reported, republished, repeated, and/or re-broadcast throughout the United States and worldwide, via social media, blogs, and other media, and continue to be republished, repeated, and re-broadcast.

42. As of August 15, 2016, a Google® Internet search using the term Richard Carrier produced 48,500,000 results, including news articles and blogs that repeat these defamatory statements and accusations, and otherwise report and comment on them.

43. At the time they were written, Defendants knew their statements to be false or were made with reckless disregard as to truth or falsity.

44. By falsely claiming, without privilege, that Dr. Carrier committed sexual harassment as well as other corrupt and lascivious acts, the Defendants intended to inflict a vicious, deliberate, and calculated attack on Dr. Carrier's character, reputation, and professional standing, and to turn the academic and skeptic communities against Dr. Carrier, and to cause them to have contempt, scorn, disgust, and hatred for him, and to hold him in the lowest possible regard.

45. The Defendants' statements stigmatize Dr. Carrier as guilty of serious criminal offenses involving moral turpitude, allege behavior incompatible with the proper conduct of his business and trade, and injure his professional standing.

46. At the time their intentional false statements were made, the Defendants knew of Dr. Carrier's valid business expectancies described above.

47. At the time they were written, Defendants knew their statements to be false or were made with reckless disregard as to truth or falsity.

### TOLLING THE STATUTE OF LIMITATIONS IN MISSOURI

48. Though Plaintiff is filing a claim of defamation in Missouri after the statute of limitations in Missouri has run, law and precedent provide exceptions to be made, by an "equitable tolling" of the statute, and thus extension of that required time, when a plaintiff has nevertheless followed due process in a timely manner.

49. Plaintiff's prior counsel has already summarized the law and basis warranting such relief in Plaintiff's case (*Carrier v. FreethoughtBlogs*, Docket 31, "Motion for Miscellaneous Relief"), establishing the Plaintiff meets all the conditions normally warranting equitable tolling (per *Dixon v. Gonzales*, 481 F.3d 324, 331), including satisfying the Ohio saving statute (Ohio Revised Code § 2305.19(A) per http://codes.ohio.gov/orc/2305.19), which allows Plaintiff to re-file a claim dismissed without prejudice within one year of its dismissal (a plaintiff "may commence a new action within one year after the date of…the plaintiff's failure otherwise than upon the merits," *Ibid.*).

50. Ohio statute would therefore allow Plaintiff to re-file his claim within one year of 14 November 2018, the date of the Federal Court ruling on Plaintiff's jurisdiction (*Carrier v. FreethoughtBlogs*, Docket 43) resulting in "the plaintiff's failure otherwise than upon the merits." As Plaintiff's action began in and was dismissed by a Federal court in Ohio (and not a State court), the Ohio statute establishing Plaintiff's right to re-file in an acceptable jurisdiction should reasonably apply even in the Federal court of another state if that other state has an overlapping statute conferring the same right; particularly given Rule 3 of the Federal Rules of Civil Procedure, which states that "a civil action is commenced by filing a complaint with the court," as likewise states Missouri Rule of Civil Procedure 53.01.

51. Missouri law holds that "if any action shall have been commenced within the times respectively prescribed in sections 516.010 to 516.370," which sections are inclusive of 516.140 that declares for Missouri a statute of limitations for defamation of 2 years, "and the plaintiff therein suffer a nonsuit…such plaintiff may commence a new action…within one year after such nonsuit suffered" (Mo. Rev. State § 516.230). Termination of Plaintiff's case in Federal court occurred on 14 November of 2018, establishing a "nonsuit," granting the Plaintiff until at least November 13 of 2019 to re-file in Missouri. Plaintiff has satisfied that requirement.

52. Defense's opposing brief to tolling the statute (*Carrier v. FreethoughtBlogs*, Docket 32, "Defendants' Opposition to Plaintiff's Motion to Apply the Doctrine of Prospective Equitable Tolling") stated no legally valid reasoning for not tolling the statute of limitations, whether in Ohio or Missouri.

53. It is in the interests of justice that a Plaintiff have a proper venue for the pursuit of valid claims; the Plaintiff both notified Defendant of his intent to sue and filed suit in a timely manner as would have satisfied the requirements of law in Ohio or Missouri; throughout the adjudication of the filing in Ohio Defendant was given ample notice and opportunity to gather evidence for the case; and Plaintiff made good-faith arguments for the appropriateness of a single Ohio venue for a lawsuit encompassing defendants across multiple states targeting a plaintiff in Ohio (see briefs in opposition to the motion to dismiss for lack of jurisdiction, *Carrier v. FreethoughtBlogs*, Docket 17 & 27).

54. Other questions of law or fact are beside the point whether those questions of law or fact deserve review in a proper venue. They therefore cannot themselves be legal grounds for denying the Plaintiff an equitable tolling of the statute of limitations for the very purpose of having those questions of law and fact adjudicated.

55. Plaintiff filed suit against the Defendant in Federal Court within the 2 years required by Missouri statute (Mo. Rev. State § 516.140) and has now re-filed that claim within the 1 year required by Missouri statute (Mo. Rev. State § 516.230).

56. No aspect of his case was found by any court to be conducted in bad faith. Consequently no "bad faith" argument can sustain an objection to continuing a case already begun in a timely manner in Ohio now in Missouri as required by law and judicial instruction. Nor has any "abuse of discretion" been demonstrated. Nor can any allegation of negligence prevail, as the Plaintiff has been anything but negligent in adherence to established procedure in this matter. Plaintiff has met all the required and expected conditions meriting a tolling of the statute, so that the case begun in Ohio may now be continued in Missouri as instructed.

57. In their opposing brief, Defense counsel cited several cases as if such cases argued in favor of disallowing a tolling of the statute in Plaintiff's case. None support any such conclusion. Neither *Archer v. Sullivan County*, 1997, nor *Cada v. Baxter Healthcare*, 1990, establish any grounds for declaring "promiscuous" a tolling of the statute in the present case. And *Irwin v. Dep't of Veterans Affairs*, 498 U.S. 86, 96 (1990) explicitly states "Federal courts have typically extended equitable relief only sparingly in suits against private litigants," and yet "allowing tolling where the claimant has actively pursued his judicial remedies by filing a defective pleading," which is precisely the circumstance of the Plaintiff.

58. Accordingly, Plaintiff should enjoy a trial of the facts in this pending case, now in the proper venue, which according to judicial instruction is Missouri.

## IV.  Relief

Plaintiff appeals for relief as follows...

**COUNT ONE
DEFAMATION PER SE AND PER QUOD**

59. The Plaintiff adopts, re-alleges, and incorporates by reference all allegations of the foregoing Paragraphs, as if they were set forth in full herein and further alleges the following matters.

60. Defendants' demonstrably false statements, without privilege, impute to the Plaintiff serious criminal and moral offenses involving moral turpitude and behavior incompatible with the proper conduct of his business and trade. The publication and republication of their statements of and concerning Dr. Carrier proximately caused general and special damages to the Plaintiff.

61. Defendants knew, anticipated, foresaw, and intended that their statements, with actual malice, made either with knowledge that they were false, or with reckless disregard of whether they were false or not, would be read by persons throughout the United States and the world and would damage the personal and professional reputation of the Plaintiff.

62. The Defendants' statements here identified as the "Announcement" (and evinced in the "Letter") have adversely affected the Plaintiff's business and profession and personal life, including but not limited to his scholarly credibility, speaking, teaching, writing, and publishing opportunities, book sales, and blog income, and social and romantic life, and caused psychological and emotional trauma and suffering which is continuing.

63. Defendants' statements referred to herein have caused, are causing, and will cause the Plaintiff to suffer injury to his professional standing, to his reputation, and good name; and Defendants' statements have held and will continue to hold the Plaintiff up to public scandal and ridicule.

64. Defendants' statements of and concerning Dr. Carrier were made with actual malice, made either with knowledge that they were false, or with reckless disregard of whether they were false or not, calculated to expose the Plaintiff to public scorn, hatred, and ridicule.

65. By such published statements, Defendants did injure the Plaintiff's reputation within his business and professional circles nationally and worldwide. The publication of the statements proximately caused general and special damages to the Plaintiff, adversely impacted the Plaintiff's scholarly credibility and professional standing, and opportunities for writing, teaching, speaking, book sales, and blog income, and caused the Plaintiff emotional and psychological trauma and suffering which is continuing.

## COUNT TWO
## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

66. The Plaintiff adopts, re-alleges, and incorporates by reference all allegations of the foregoing Paragraphs, as if they were set forth in full herein and further alleges the following matters.

67. At all times herein, Defendants acted intentionally and unreasonably in publishing and republishing false statements in the "Announcement" and the "Letter," maliciously, with hate, spite, or ill will toward Dr. Carrier, or with such reckless disregard of whether they were false or not, when Defendants knew or should have known that the Plaintiff's emotional distress would likely result.

68. Notwithstanding the Plaintiff's requests that Defendants cease and desist immediately from their publishing of those statements, Defendants failed and refused to do so.

69. Defendants' conduct was intentional and malicious, and done for the purpose of causing, or was known by Defendants to likely cause the Plaintiff humiliation and embarrassment, mental anguish, damage to his reputation and career, and severe emotional distress, and was done with wanton and reckless disregard for the consequences to the Plaintiff.

70. As a proximate result of the aforementioned wrongful conduct, the Plaintiff has suffered substantial monetary damages, including damages to his personal and professional reputation and career, and substantial emotional distress, anxiety, and worry.

71. Unless and until enjoined and restrained by order of this Court, Defendants' continued acts will cause the Plaintiff severe and irreparable injury which cannot adequately be compensated by monetary damages. By reason of the foregoing, the Plaintiff is entitled to preliminary and permanent injunctive relief enjoining the publication and republication of the false and defamatory publications herein described.

## COUNT THREE
## NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS

72. The Plaintiff adopts, re-alleges, and incorporates by reference all allegations of the foregoing Paragraphs, as if they were set forth in full herein and further alleges the following matters.

73. At all times herein, Defendants acted negligently and unreasonably in publishing and republishing false statements in the "Announcement" and the "Letter," maliciously, with hate, spite, or ill will toward Dr. Carrier, or with reckless disregard of whether they were false or not. In so doing, Defendants acted beyond reasonable bounds of decency, and negligently inflicted emotional distress upon the Plaintiff.

74. Notwithstanding the Plaintiff's requests that Defendants cease and desist immediately from their publishing of those statements, Defendants failed and refused to do so.

75. Defendants' conduct was negligent, and proximately caused the Plaintiff to suffer substantial humiliation and embarrassment, mental anguish, damage to his reputation and career, and severe emotional distress, and was done with wanton and reckless disregard for the consequences to the Plaintiff.

76. As a proximate result of the aforementioned wrongful conduct, the Plaintiff has suffered substantial monetary damages, including damages to his personal and professional reputation and career, and substantial emotional distress, anxiety, and worry.

77. Unless and until enjoined and restrained by order of this Court, Defendants' continued acts will cause the Plaintiff severe and irreparable injury which cannot adequately be compensated by monetary damages. By reason of the foregoing, the Plaintiff is entitled to preliminary and permanent injunctive relief enjoining the publication and republication of the false and defamatory publications herein described.

WHEREFORE, on the preceding basis, the Plaintiff, Richard Carrier, Ph.D., respectfully prays that the Court:

A. Assume jurisdiction of this case;

B. For Count I, enter a judgment in favor of the Plaintiff and against Defendants for compensatory damages in the amount of two hundred and fifty thousand dollars ($250,000), punitive damages in the amount of two hundred and fifty thousand dollars ($250,000), plus both pre-judgment and post-judgment interest, the costs of this action, and for such other and further relief as this Court finds just and equitable;

C. For Count II, enter a judgment in favor of the Plaintiff and against Defendants for compensatory damages in the amount of two hundred and fifty thousand dollars ($250,000), punitive damages in the amount of two hundred and fifty thousand dollars ($250,000), plus both pre-judgment and post-judgment interest, the costs of this action, and for such other and further relief as this Court finds just and equitable;

D. For Count III, enter a judgment in favor of the Plaintiff and against Defendants for compensatory damages in an amount in excess of Fifty Thousand Dollars ($75,000), and for punitive damages in an amount in excess of Fifty Thousand Dollars ($75,000), plus both pre-judgment and post-judgment interest, the costs of this action, and for such other and further relief as this Court finds just and equitable;

E. For Count IV, enter a judgment in favor of the Plaintiff and against Defendants for compensatory damages in an amount in excess of Fifty Thousand Dollars ($75,000), and for punitive damages in an amount in excess of Fifty Thousand Dollars ($75,000), plus both pre-judgment and post-judgment interest, the costs of this action, and for such other and further relief as this Court finds just and equitable;

F. And for any or all Counts enter a judgment for preliminary and permanent injunction against Defendants and all persons acting under their control, from any and all activity that would cause the publication and republication of the false and defamatory statements, in any and all formats, including all electronic and physical media.

The Plaintiff hereby requests a trial by jury on all triable issues, pursuant to Fed. R. Civ. P. 38(b).

## V. Certification and Closing

Under Federal Rule of Civil Procedure 11, by signing below, I certify to the best of my knowledge, information, and belief that this complaint: (1) is not being presented for an improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation; (2) is supported by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law; (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) the complaint otherwise complies with the requirements of Rule 11.

### A. For Parties Without an Attorney

I agree to provide the Clerk's Office with any changes to my address where case–related papers may be served. I understand that my failure to keep a current address on file with the Clerk's Office may result in the dismissal of my case.

I declare under penalty of perjury that the foregoing is true and correct.

Date of signing: 27 APRIL 2019

Signature of Plaintiff

Printed Name of Plaintiff  RICHARD C. CARRIER